USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/31/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE CITY OF NEW YORK,

                              Plaintiff,

            -v-

AMJED HATU, AMMAR SHAMAKH, MAEEN
ALSAIDI, MUSSA HAMZA, AND AKRAM
SHAMAKH,

                              Defendants.

---

18 Civ. 848 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

The City of New York (the "City") brings this action against various associates of the "Moflehi Enterprise" (the "Enterprise"), a group of wholesalers, distributors, and brokers that allegedly operated an unlawful cigarette distribution scheme between New York, New Jersey, North Carolina, and Virginia. Specifically, the City claims that the defendants violated the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. §§ 2341 *et seq.*; the Racketeer Influenced Corrupt Organizations Act (the "RICO Act"), 18 U.S.C. §§ 1961 *et seq.*; the Jenkins Act, as amended by the Prevent All Cigarette Trafficking Act of 2010 (collectively, the "PACT Act"), 15 U.S.C. §§ 375 *et seq.*; and New York Public Health Law ("P.H.L.") § 1399-*ll*.

In September 2018, the Court granted a motion, by defendant Amjed Hatu, to dismiss the claims against him, as formulated in the City's Amended Complaint. *See* Dkt. 64. The Second Amended Complaint ("SAC"), Dkt. 95, the operative complaint now, enhances the allegations against Hatu, and reprises the City's claims against the following four defendants: Ammar Shamakh, Maeen Alsaidi, Mussa Hamza, and Akram Shamakh. Hatu is a principal of former defendant H&H Distributors ("H&H"), a wholesale cigarette distributor with a principal place of

business in North Carolina. SAC at 3. The remaining defendants are individuals who allegedly either transported, or facilitated the transportation of, cigarettes from within North Carolina to other states. *Id.* at 2–3. The Court refers to these defendants as the "Non-Moving Defendants."

Hatu now moves to dismiss the SAC's claims against him, again on the grounds that these do not satisfy Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). This time, for the following reasons, the Court denies Hatu's motion to dismiss in its entirety.

## I.      Background

### A.      Facts[1]

#### 1.      The Regulatory Background

In an effort to reduce the use of tobacco products, the State of New York and New York City impose considerable taxes on cigarettes. SAC ¶ 23. At the state level, this tax is imposed principally by New York Tax Law §§ 471 and 471-a. These statutes levy a tax of $4.35 per 20-cigarette pack on "all cigarettes possessed in the state by any person for sale," N.Y. Tax L. § 471, or "used" in the state, *id.* § 471-a. The City imposes an additional tax of $1.50 per 20-cigarette pack possessed by any person for sale or use in the City. N.Y.C. Admin. Code § 11-1302(a)(1). These taxes presumptively apply to all cigarettes sold within the State and City, and the individual claiming that a sale is not taxable under any of the applicable statutes bears the

---

[1] The Court draws these facts principally from the SAC, Dkt. 95, and the affidavits of Detective Jonathan Dubroff, Dkt. 73-1 ("Dubroff Aff."), Mussa Hamza, Dkt. 73-3 ("Hamza Aff."), and Akram Shamakh, Dkt. 73-4 ("Akram Aff."), each of which are referenced in the SAC, *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the SAC as true, drawing all reasonable inferences in plaintiff's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). As described more fully below, for purposes of resolving the motion to dismiss for lack of personal jurisdiction, the Court may consider materials outside the SAC and has done so here.

burden of establishing such an exemption.  *See* N.Y. Tax L. § 471(1); N.Y.C. Admin. Code § 11-1302(e).

Both the New York Tax Law and New York City Administrative Code require that a tax stamp be affixed to cigarette packages to indicate that the requisite taxes have been paid.  N.Y. Tax L. §§ 471, 473; N.Y.C. Admin. Code §§ 11-1302, 1304.  These laws authorize "stamping agents" to pre-pay the cigarette taxes by purchasing tax stamps from the State and City.  SAC ¶ 28.  The cost of each stamp is equivalent to the amount of tax imposed on a pack of cigarettes.  *Id.*  Agents are required to affix the stamps to cigarette packs and to add to the cost of any such stamped pack the price of the stamp affixed thereto.  Retailers, accordingly, adjust the price of the cigarette packs they sell to account for the higher cost of the stamped packs.  Thus, the cost of the tax moves along the distribution chain before falling on the consumer.  *Id.*  Stamping agents are the only entities authorized to purchase and affix State and City tax stamps to cigarettes and to import into the State and City cigarettes that have not yet been taxed.  *Id.* ¶ 29.

### 2.     The Enterprise

In contrast to the rates applicable in New York State and New York City, North Carolina's cigarette tax rate is among the nation's lowest.  *Id.* ¶ 30.  New York State and New York City impose a combined $58.50 in excise taxes per each 200-cigarette carton.  North Carolina imposes only $4.50 in analogous taxes on such a carton.  *Id.* ¶ 2.  These excise taxes are pre-paid and, in the manner above, are included in the retail price of cigarettes.  Cigarettes are, accordingly, far more expensive in New York City than in North Carolina.

Important here, the difference between the higher New York cigarette tax rates and the lower North Carolina rate creates an arbitrage opportunity for individuals who sell cigarettes in New York despite having paid only the lower North Carolina tax on those cigarettes.

The SAC claims that the defendants engaged in such a scheme.  As alleged, members of the Enterprise, *inter alia*, transported cigarettes that had been taxed in North Carolina to New York City for distribution throughout the State without paying the requisite New York State and City taxes.  *Id.* ¶¶ 1–2.[2]  The alleged role of each defendant in the Enterprise is as follows.

### a.     Transporters

Ammar Shamakh ("Ammar") and his employee Maeen Alsaidi ("Alsaidi"), both residents of New York, allegedly transported cigarettes purchased in North Carolina to New York for sale in the Bronx and elsewhere.  *Id.* ¶¶ 4, 19–20.  A member of the Enterprise in New York would transmit to the Transporters Ammar and Alsaidi via text message an order requesting a variety of cigarette brands and styles.  *Id.* ¶ 37.  Ammar and Alsaidi would then relay a nearly identical message via text message to a North Carolina Retailer who would fulfill the order.  *Id.*

### b.     Retailers and Brokers

Akram Shamakh ("Akram"), a resident of North Carolina, *id.* ¶ 18, owns A&K Express, a convenience store located in North Carolina that sells cigarettes taxed in North Carolina, *id.* ¶ 5.  Akram has admitted to selling large quantities of such cigarettes to Ammar and Alsaidi with the understanding that they would be transporting those cigarettes to New York.  *Id.*

Mussa Hamza ("Hamza"), a resident of North Carolina, *id.* at ¶ 17, was a cigarette broker, *id.* at ¶ 6.  Hamza has admitted that in this role he arranged the sale of large quantities of North Carolina-taxed cigarettes to Ammar and Alsaidi for sale in New York.  *Id.*

---

[2] The City refers to cigarettes distributed in New York as part of such a scheme as "untaxed cigarettes."  SAC ¶ 1 n.1.  Because these cigarettes were taxed in North Carolina, but do not bear authentic New York tax stamps, the Court uses the more precise term "under-taxed cigarettes."

c.    *H&H Defendants*

H&H is a cigarette wholesaler located in North Carolina. *Id.* ¶ 7. The moving defendant

Hatu is a resident of North Carolina. *Id.* ¶ 16. He and Shareef Hassan are principals of H&H.[3]

The SAC alleges that a retailer participating in the scheme, such as Akram and Hamza, would

text a cigarette order to H&H, Hassan, or Hatu (collectively the "H&H Defendants"). *Id.* ¶ 37.

This order would be virtually identical to that transmitted via text from the Enterprise in New

York to the transporters and then to the retailers and Hamza. *Id.* H&H would fulfill these

orders, delivering large quantities of North Carolina-taxed cigarettes to the transporters Ammar

and Alsaidi, both directly and through Akram or Hamza, for distribution in New York. *Id.*

Upon receiving the imported cigarettes in New York, other members of the Enterprise would

then affix counterfeit New York tax stamps to the packaging and sell the cigarettes in New York

at below-market prices.

H&H operated only in North Carolina and directly sold cigarettes only to the North

Carolina Retailers. Nonetheless, the SAC alleges that Hatu knew that the cigarettes he and H&H

supplied were destined for illegal distribution in New York City. In support, the SAC cites the

following evidence set forth in the attached affidavits of Akram, Hamza, and Detective Jonathan

Dubroff of the New York City Police Department ("NYPD").

First, Akram attests that Hatu and Hassan "recognized" that A&K's cigarette orders were

far too large to be supplying only A&K's retail sales. Akram Aff. ¶ 15. He further states that he

explained to Hatu and Hassan that he was purchasing large volumes of cigarettes to supply

---

[3] H&H and Hassan were both named as defendants in the City's earlier complaints. In its bench
ruling on September 24, 2018, the Court dismissed the claims against these defendants, like
those against Hatu, for want of personal jurisdiction. However, after those complaints were
filed, Hassan filed for Chapter 11 bankruptcy, as discussed *infra*. Based on that filing, the City
explains, it elected not to bring claims against him and H&H in the SAC. SAC ¶ 17 n.3.

cigarettes to individuals transporting those "cigarettes to New York or other states." *Id.* Akram states that he would receive a text message from Ammar or Hamza with an order. He would then text the order to Hatu or Hassan. When H&H filled the order, "H&H employees would load the cases directly from the H&H van into the vehicles going to New York." *Id.* ¶ 18. Finally, Akram states that he has "had many conversations with Hatu and Hassan in which we all understood that the cigarettes they were selling to Ammar and Alsaidi were being transported to New York and other places for sale." *Id.* ¶ 20.

Second, Hamza attests that "Hatu and Hassan both knew that the cigarettes being delivered to Alsaidi and Ammar were going to be brought to New York." Hamza Aff. ¶ 9. He states that he had many conversations in 2016 and 2017 in which Hatu and Hassan demonstrated their understanding that the cigarettes H&H delivered to Alsaidi and Ammar were to be shipped to New York where they would be sold. *Id.*

Third, the Dubroff Affidavit sets forth the following facts, among others. Hatu allegedly created false invoices to hide the considerable number of sales he made to cigarette traffickers. Dubroff Aff. ¶ 20. For example, on January 9, 2017, during a telephone call, Hamza directed Hatu to invoice 150 cartons of cigarettes for Asia, 210 for Quality, and 210 for Madison, which were all names of North Carolina stores. *Id.* ¶ 20a. Similar conversations took place in 2016 on November 21, 23, and 28 and on December 2 and 19. *Id.* ¶ 20d. Other relevant conversations involving Hatu include a March 6, 2017 call between Hatu and Hassan. Compl. ¶ 48(5). During that call, which took place approximately one week after two Transporters had been stopped by the NYPD while delivering cigarettes in New York City, Hatu told Hassan that, earlier in the week, "Hamza and Akram's guy" had been "robbed on the highway" of 6,000 cartons of cigarettes. *Id.* The SAC alleges that "Hamza" and "Akram" likely refer to defendants (and

North Carolina Retailers) Mussa Hamza and Akram Shamakh, and that the "robbery" was the NYPD stop referenced above. *Id.* On the same call, Hatu also noted that "they" had been "hit" for $90,000 six months ago by the same two "robbers." *Id.* This portion of the conversation, the SAC alleges, likely referred to another NYPD seizure that had taken place approximately four months prior, in which the NYPD seized approximately $100,000 from a vehicle operated by a Moflehi Enterprise Transporter. *Id.* ¶ 48(3). According to the SAC, Hatu then observed that "they"—another likely reference to Moflehi Enterprise Transporters, per the SAC—"had to get a new car and a new route." *Id.* ¶ 48(9).

### B.   Procedural History

On January 31, 2018, the City filed its initial complaint. *See* Dkt. 1. On April 4, 2018, three of the original defendants—Mussa Hamza, Akram Shamakh, and Anwar Alsaidi—each filed an answer. *See* Dkts. 17–19. On May 3, 2018, the remaining three original defendants—Amjed Hatu, Shareef Hassan, and H&H Distributors—each filed a motion to dismiss the complaint. *See* Dkts. 22, 24. On May 4, 2018, the Court issued an amend or oppose order directing the City to file an amended complaint or an opposition brief by May 24, 2018. Dkt. 27.

On May 25, 2018, the City filed the Amended Complaint ("AC"). *See* Dkt. 29. On June 14, 2018, Hatu filed a motion to dismiss the AC, Dkt. 33, and a supporting memorandum of law, Dkt. 34. On June 14, 2018, H&H and Hassan filed a motion to dismiss the AC, Dkt. 35, a supporting memorandum of law, Dkt. 36, a supporting declaration of Paul S. Huegel, Esq., and accompanying exhibits, Dkt. 37. On June 25, 2018, the remaining defendants filed an answer to the AC. Dkt. 39.

On July 6, 2018, the City filed an opposition to both motions to dismiss. Dkt. 43. On July 26, 2018, Hatu filed a reply brief, Dkt. 46, as did H&H and Hassan, Dkt. 48. On August 6, 2018, Hassan filed a notice informing the Court that he had filed for Chapter 11 bankruptcy.

Dkt. 53.  On August 7, 2018, the City filed a corrected opposition brief.  Dkt. 55.  On September 14, 2018, Hassan filed a letter informing the Court that the Bankruptcy Court had granted his request for a stay of this action as to the claims against him and H&H.  Dkt. 60.

On September 24, 2018, on the record of the initial pretrial conference, the Court dismissed the claims against Hatu, Hassan, and H&H, for lack of personal jurisdiction.  Dkt. 64.

On November 16, 2018, the City filed a letter motion seeking to amend the AC, Dkt. 72, and a declaration of Eric Proshasky, Esq., Dkt. 73, with accompanying affidavits.  Among these affidavits were the proposed SAC, which attaches affidavits of Detective Dubroff, Dkt. 73-1, Mussa Hamza, Dkt. 73-3, and Akram Shamakh, Dkt. 73-4.  On November 20, 2018, the Court granted that motion and set a deadline for responsive pleadings.  Dkt. 75.

On December 20, 2018, Hatu filed a motion to dismiss the SAC, Dkt. 80, and a supporting memorandum of law, Dkt. 81 ("Hatu Mem.").  On January 21, 2019, the City filed its opposition brief, Dkt. 84 ("Pl. Mem."), a declaration of Eric Proshansky, Dkt. 85, and accompanying exhibits.  On January 31, 2019, the City filed the SAC, Dkt. 95, and requested summonses for the newly added defendants, Ammar Shamakh and Maeen Alsaidi, Dkts. 97–98.

On February 21, 2019, the City filed a letter alerting the Court to supplemental authority relevant to Hatu's motion.  Dkt. 106.  On February 14, 2019, Hatu filed his reply.  Dkt. 107.

## II.    Hatu's Motion to Dismiss for Lack of Personal Jurisdiction

Where, as here, a defendant moves to dismiss both for lack of personal jurisdiction and for failure to state a claim, the Court considers first whether it can exercise personal jurisdiction. *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. Feb. 19, 2008) ("Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional

8

issues before considering whether a claim is stated in the complaint." (citation omitted)).

Accordingly, the Court resolves Hatu's 12(b)(2) motion before addressing his 12(b)(6) motion.

### A.    Applicable Legal Standards

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the

defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted);

*see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  What a

plaintiff must show "to defeat a defendant's claim that the court lacks personal jurisdiction over

it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v.

Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie

Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  In the posture here, where a case is

prior to discovery, a plaintiff may defeat such a jurisdiction-testing motion "by pleading in good

faith[] legally sufficient allegations of jurisdiction.  At such a preliminary stage, the plaintiff's

*prima facie* showing may be established solely by allegations." *Id.*; *see also In re Terrorist

Attacks*, 714 F.3d at 673 ("In order to survive a motion to dismiss for lack of personal

jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists." (citation

omitted)).

A plaintiff may make this showing through its "'own affidavits and supporting materials,

containing an averment of facts that, if credited, would suffice to establish jurisdiction over the

defendant.'" *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting

*Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)).  The Court "construe[s] the

pleadings and affidavits in the light most favorable to [the] plaintiff[], resolving all doubts in [the

plaintiff's] favor." *Dorchester*, 722 F.3d at 85 (quoting *S. New Eng. Tel.*, 624 F.3d at 138); *cf.

A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[W]here the issue is

9

addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." (citation omitted)).   The Court, however, will neither "draw argumentative inferences in the plaintiff's favor" nor "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted).

"In a federal question case, where the defendant resides outside the forum state, federal courts apply the forum state's personal jurisdiction rules if the applicable federal statute does not provide for national service of process." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) (citation omitted).   With the exception of the RICO Act, the federal statutes under which the City sues here do not provide for national service of process.   Accordingly, New York's long-arm statute, New York Civil Practice Law and Rules ("C.P.L.R.") § 302(a), governs the majority of the claims in the instant action.   *See id.*; *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000).

Under C.P.L.R. § 302(a)(1), two conditions must be met for a court to exercise personal jurisdiction over a non-domiciliary defendant.   First, the defendant must "transact . . . business within the state or contract[] anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1) (2006).   Second, the cause of action must arise from the "act[s] which are the basis of jurisdiction." *Id.*   The Second Circuit has held that this second condition requires a showing that the contacts with the state had a "substantial relationship" to the cause of action. *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006).

Section 302(a)(1) is a "single act" statute; therefore, the defendant need not have engaged in more than one transaction in, or directed to, New York for New York courts to invoke jurisdiction. *See Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 70

(2006). Such jurisdiction exists even if "the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988) (citations omitted); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir.1999) (finding personal jurisdiction based on a single transaction where defendant was not physically present in state). A court may also find jurisdiction based on the totality of the defendant's conduct. *See, e.g., CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." (citations omitted)).

Section 302(a)(2) provides an alternative basis for personal jurisdiction over a defendant who "in person or through an agent . . . commits a tortious act within the state." As with § 302(a)(1), "there is no minimum threshold of activity required so long as the cause of action arises out of the allegedly infringing activity in New York." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 567 (S.D.N.Y. 2000). Even "[o]ffering one copy of an infringing work for sale in New York . . . constitutes commission of a tortious act within the state sufficient to imbue [the] Court with personal jurisdiction over the infringers." *Id.* (quoting *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*, 829 F. Supp. 62, 64 (S.D.N.Y. 1993)).

Once a *prima facie* showing of a state-law statutory basis for jurisdiction has been made, plaintiff must then "demonstrate that the exercise of jurisdiction comports with due process." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F. 3d 68, 81–82 (2d Cir. 2018) (internal alterations omitted).

**B.      Discussion**

**1.      The Prior Motion to Dismiss**

On September 24, 2018, in a bench ruling, the Court dismissed the claims against the H&H Defendants for lack of personal jurisdiction.  Dkt. 64.  The Court noted that the AC did not allege any presence in New York by any of these defendants or any actual dealings between these defendants and any New York person or entity.  And as to the claims that the H&H Defendants had known the cigarettes in question would be sold in New York, the Court—considering only the allegations in the AC, which did not include the factual affidavits now incorporated by the SAC—found that the City failed to plead sufficient facts to establish that any of them had known that cigarettes they sold to Enterprise members in North Carolina were being shipped to and illegally distributed in New York.

As to the non-RICO claims, the Court found that the AC failed to establish jurisdiction under any provision of the New York long-arm statute, C.P.L.R. § 302.  Hrg. Tr. at 15.  The Court explained that the AC failed to meet the requirements of any subsection of § 302 because, "at bottom, the [AC] fails to plausibly allege as a matter of fact that the H&H Defendants knew that any of the cigarettes they sold were destined for resale in New York." *Id.*  This was required because the AC did not allege any other potential basis for personal jurisdiction, including that any of the H&H Defendants had "ever set foot in New York or negotiated directly with New York parties"; therefore, to subject the H&H Defendants to suit in New York, the AC had to allege that they knew of the scheme or should have known that the consequences of their tortious actions would have had consequences in New York. *Id.* at 15–16 (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122–23 (2d Cir. 1981)).  The AC did not support those inferences.

The Court analyzed the five pertinent allegations in the AC and discussed in detail why, separately and together, they did not support the inference that the H&H Defendants had known that the scheme would entail sales in New York. First, the AC's allegations of different tax rates for cigarettes sold in New York versus North Carolina established the fact of the disparity, not the H&H Defendants' knowledge of it or illegal sales in New York motivated by that disparity. *Id.* at 16–17. Second, the AC's allegations that the H&H Defendants occasionally delivered cigarettes to trucks bearing non-North Carolina license plate numbers did not establish that any of these vehicles had New York plates, and the AC assumed but did not plead that these defendants had noticed the out of state plates or inferred from them that such vehicles were likely to transport cigarettes to those states. *Id.* at 17. Third, the allegation that the H&H Defendants sometimes delivered cigarettes directly to retailers' vehicles did not show knowledge of a scheme to transport cigarettes to New York, or even outside of North Carolina. *Id.* at 18. Fourth, the AC's account of a phone call between Hatu and Hassan to the effect that a truck had been robbed of 6,000 cartons of cigarettes did not reveal the H&H Defendants' knowledge that this event had occurred in New York. *Id.* at 18–21. Fifth, the AC's allegations that certain brands of cigarettes were more or less popular in New York relative to North Carolina did not suggest the H&H Defendants' knowledge that the cigarettes they were delivering in North Carolina were likely to be sold in New York. *Id.* at 21–22. Accordingly, the Court held, it lacked personal jurisdiction to hear the City's non-RICO claims.

As to the RICO claims, the Court noted that, while the RICO statute provides its own statutory basis for jurisdiction, "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *Id.* at 13 (quoting *PT United Can Co. v. Crown Cork & Sea Co.*, 138 F.3d 65, 71 (2d Cir. 1998)).

To determine whether a defendant had sufficient minimum contacts with the forum state, the Court noted, courts consider whether the defendant purposely availed itself of the benefits and privileges of the forum state's law. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985). Applying that framework, the Court found that because the AC did not give rise to a plausible inference that the H&H Defendants knew they were taking part in a cigarette smuggling scheme, "[i]t follows *a fortiori* that they did not purposefully direct their conduct at New York." Hrg. Tr. at 24. Further, assuming *arguendo* that the Court had personal jurisdiction over the Non-Moving Defendants, the Court applied 18 U.S.C. § 1965(b) which provides for jurisdiction over parties who do not reside in the district where the "ends of justice" so require. *See PT United*, 138 F.3d at 71. The Court explained that "[t]his limitation reflects RICO's 'first preference . . . to bring the action where suits are normally expected to be brought' rather than 'hailing defendants into far-flung fora.'" Hrg. Tr. 14 (quoting *PT United*, 138 F.3d at 71–72). Because all of the defendants reside in North Carolina, the Court held that the "ends of justice" did not require that the lawsuit be brought in New York. Accordingly, the Court dismissed the City's RICO claim, too.

### 2. Motion to Dismiss the SAC

The SAC, like the AC, does not allege that Hatu was ever physically present within New York. Accordingly, as the Court explained in its prior decision, to satisfy C.P.L.R. §§ 302(a)(1)–(2), the SAC must allege either that "a member of the Moflehi Enterprise acted in New York with the 'knowledge and consent' of the H&H Defendants, or that the H&H Defendants and their alleged co-conspirators in New York acted with a 'common purpose by common agreement or

14

understanding.'" Hrg. Tr. at 15–16 (quoting *Grove Press*, 649 F.2d at 122–23).[4]   The Court

finds that the SAC—now fortified by the Hamza, Akram, and Dubroff Affidavits—clears this

bar, in that it adequately alleges Hatu's knowledge that the cigarettes which he and the other

H&H Defendants delivered were destined for sales in New York.

a.     <em>C.P.L.R. § 302(a)(1)</em>

Critically important, the SAC incorporates the affidavits of two of Hatu's alleged co-

conspirators, Hamza and Akram, each of whom states specifically that he had conversations with

Hatu regarding the scheme to transport North Carolina taxed cigarettes *into New York* for sale.

Unlike the AC, which repeatedly relied on the conclusory statement that Hatu and the other

H&H Defendants had "full knowledge that the North Carolina retailers intended to and did in

fact transfer the cigarettes to the Moflehi Enterprise for distribution and sale in New York City,"

AC ¶¶ 41, 98, the allegations here are more concrete and fulsome.  They are plain statements of

fact offered by two percipient witnesses.  And each affiant states explicitly that he explained to

Hatu that the cigarettes he was selling to Ammar and Alsaidi were being sent to New York to be

sold there without first being subject to the requisite excise taxes.  *See* Hamza Aff. ¶ 9 ("I had

many conversations with Hatu individually . . . in which [he] understood that the cigarettes

delivered by H&H to Ammar and Alsaidi were to be transported to New York, where they could

be sold for a much higher price than the price for which they could be sold in North Carolina.");

Akram Aff. ¶ 16 ("I discussed with Hatu and Hassan that a good profit could be made by persons

who bought cigarettes in North Carolina and selling [sic] them in New York, because the high

New York taxes made it much more expensive to purchase cigarettes in New York.").

---

[4] The City alternatively contends that the Court has personal jurisdiction under C.P.L.R.
§ 302(a)(3)(ii).  The Court has no occasion to reach this question, given its finding that it has
personal jurisdiction under the first two provisions.

To be sure, Hamza does not state that he informed Hatu that Ammar and Alsaidi, or any other Enterprise member down the distribution chain, would affix forged New York tax stamps to the cigarettes shipped by H&H. But this detail is not required. The implication is clear, and the circumstantial inference is strong, that Hatu appreciated that the higher New York taxes would not be paid. Among other things, Akram credibly attests that he understood that Hatu's motivation for participating in the scheme was to profit from the increased sales volume occasioned by the cigarettes that would be smuggled into New York. Akram Aff. ¶ 16. Had Ammar, Alsaidi, and other Enterprise members who operated the scheme in New York paid the proper taxes, so as to increase the retail sales price of their cigarettes to align with those sold lawfully in New York, there would be less reason to expect increased sales volumes for the cigarettes Hatu sold. As a result, Hatu would have had far less, if any, economic incentive to ship cigarettes far from his home base. In addition, as alleged, Hatu not only discussed these economic incentives with Akram and Hamza, but he also altered invoices to conceal the suspiciously high volume of cigarettes he sold to Ammar and Alsaidi. SAC ¶ 48(1) (citing Dubroff Aff. ¶ 20); *see also id.* ¶¶ 41–43. These allegations alone provide a strong basis from which to infer that Hatu was aware of the scheme to sell under-taxed cigarettes in New York, and that he knowingly participated in that scheme anticipating financial gain from the sales there of under-taxed cigarettes.

Statements attributed to Hatu in the Dubroff Affidavit further support the inference that he was aware of the Enterprise's New York sales and that he stood to gain financially by supplying cigarettes to that Enterprise. Among other things, Detective Dubroff attests to an intercepted conversation between Hatu and Hassan in which Hatu discussed how the police's seizure of approximately $300,000 worth of cigarettes from Ammar and Alsaidi would harm his

16

business.  SAC ¶ 28(4) (citing Dubroff Aff. ¶ 25.f).  Read in conjunction with the allegations in the Hamza and Akram Affidavits, these allegations amply plead Hatu's knowledge that he was participating in a scheme to sell under-taxed cigarettes in New York.  The SAC thus adequately alleges that Hatu contracted in North Carolina with Ammar and Alsaidi "to supply goods or services in the state" of New York.  C.P.L.R. § 302(a)(1).

Hatu counters by terming the factual affidavits vague and inconsistent.  This critique misses the mark.  The factual affidavits are plenty specific.  Hamza and Akram each state clearly that he had at least one conversation with Hatu in which he explained to Hatu that the large volume of cigarettes he ordered were going to be shipped to and sold in New York.  Hamza and Akram further state that they each discussed with Hatu how the sales in New York would benefit Hatu's business in North Carolina.  While Hatu will be at liberty at trial to seek to impeach these claims, these allegations easily suffice for pleading purposes.  And, on a motion to dismiss a complaint prior to discovery, any ambiguities in the complaint and the incorporated affidavits are to be resolved in the plaintiff's favor.  *A.I. Trade Fin., Inc.*, 989 F.2d at 79–80.

b.      *C.P.L.R. § 302(a)(2)*

For much the same reasons, the Court also has personal jurisdiction under C.P.L.R. § 302(a)(2), which authorizes jurisdiction over an out-of-state defendant who commits a tortious act in New York either in person or through an agent.  To establish personal jurisdiction under § 302(a)(2) on a conspiracy theory, a plaintiff must: "(1) make a *prima facie* factual showing of a conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) show that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in this jurisdiction."  *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992).  Each of these elements is met here.

i.      Conspiracy

As discussed in greater detail *infra* pp. 29–31, the SAC adequately pleads Hatu's

participation in a RICO conspiracy predicated upon violations of the CCTA.  The Hamza and

Akram Affidavits attest implicitly, if not explicitly, to an agreement between Hatu, Ammar, and

Alsaidi, and persons downstream in the distribution chain, in which Hatu (and H&H) would

supply the other two with large quantities of cigarettes that they would then transport for sale in

New York, and in which H&H employees would load cases of cigarettes "directly from the H&H

van into the vehicles going to New York."  Akram Aff. ¶ 18.  These and other allegations amply

plead the existence of a conspiracy and Hatu's agreement to participate in it.

ii.      Membership in Conspiracy

To adequately allege that Hatu was a member of a conspiracy, the SAC need not allege a

formal agency relationship.  Instead, it must merely include plausible factual allegations that the

out-of-state defendant was aware of the effects in New York of the co-conspirators' activity, that

the co-conspirators' activity in New York "was to the benefit of the out-of-state conspirators,"

and that the New York co-conspirators were acting "at the direction or under the control . . . or at

the request or on behalf of the out-of-state defendant."  *Chrysler Capital Corp. v. Century Power

Corp.*, 778 F. Supp. 1260, 1269 (S.D.N.Y. 1991) (quotation marks and citations omitted).

For the reasons reviewed, the SAC clears this bar.  It alleges specific facts warranting the

inference that Hatu was a member of the conspiracy and knew that his co-conspirators—the

downstream sellers of the cigarettes he distributed—would commit tortious acts within New

York.  The facts that support this inference include that Hatu made sales to individuals he knew

transported cigarettes to New York to be sold there without application of the applicable New

York taxes, *see* SAC ¶¶ 35–36, 46, 41–43; Hamza Aff. ¶¶ 5–10; Akram Aff. ¶¶ 15–20, and that

he altered invoices to mask his high volume of sales to members of the Enterprise, *see* SAC

¶¶ 41–43, 48(1). The SAC further alleges that Hatu and the other conspirators would benefit

from the scheme because the under-taxed cigarettes would generate an increase in the volume of

sales in North Carolina. *See Sea Trade Mar. Corp. v. Coutsodontis*, No. 09 Civ. 488 (BSJ)

(HBP), 2012 WL 3594288, at *9 (S.D.N.Y. Aug. 16, 2012) (finding that actions taken to the

mutual benefit of in-state and out-of-state co-conspirators were on behalf of both sets of

conspirators).

iii.    Tortious Act Pursuant to Conspiracy

Finally, the SAC alleges that Hatu's co-conspirators committed a tortious act in New

York in furtherance of the conspiracy. Specifically, the SAC alleges that "on or about and

between May 7, 2016 and May 4, 2017," Ammar and Alsaidi unlawfully transported and sold

"on average 5,000 unstamped or unlawfully stamped cartons of cigarettes subject to the cigarette

tax of New York City and New York State." Dubroff Aff. ¶ 40. This satisfies the tortious act

requirement of C.P.L.R. § 302(a)(2).

c.    *Nexus Between Contacts with Forum and Cause of Action*

To have personal jurisdiction under either § 302(a)(1) or 302(a)(2), the City must also

show that its claims here arise from the "act[s] which are the basis of jurisdiction." C.P.L.R.

§ 302(a). That requirement is met here because the sale in New York by members of the

Enterprise of cigarettes that had not eluded New York's cigarette taxes are the transactions on

which jurisdiction is based, and these are the basis for the City's CCTA claims. The Court thus

has specific jurisdiction under C.P.L.R. §§ 302(a)(1)–(2).

d.    *Due Process*

Having held that New York's long-arm statute authorizes the exercise of jurisdiction over

Hatu, the Court, finally, must satisfy itself that this exercise is consistent with due process. To

19

do so, the Court applies both a minimum-contacts test and a reasonableness inquiry. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).

To determine whether a defendant has sufficient minimum contacts with the New York venue, the Court considers whether the defendant "'purposefully availed itself' of the privilege of doing business in the forum state and could 'reasonably anticipate being haled into court there.'" *Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551, 557 (S.D.N.Y. 2007) (quoting *Burger King Corp.*, 471 U.S. at 474–75 (1985)). Here, Hatu's contacts with New York—knowingly causing cigarettes that have not been subject to the New York State or City cigarette tax to be sold to consumers in New York—readily qualifies as purposeful availment, so as to satisfy the minimum contacts test.

Although a plaintiff's showing of "minimum contacts" will generally satisfy due process, the defendant can present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir.1996) (quoting *Burger King*, 471 U.S. at 477). The reasonableness inquiry "hinges on whether the assertion of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 107 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Court weighs five factors when determining reasonableness:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial[] system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering social substantive policies.

*Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999) (internal quotations and citations omitted).

These factors make the exercise of jurisdiction entirely reasonable here. Hatu allegedly sold North Carolina-taxed cigarettes to retailers and other members of the Enterprise knowing that those cigarettes would be shipped to New York and sold within New York without any member of the distribution chain having ever paid New York taxes on those cigarettes. Having chosen to participate in this scheme, Hatu could reasonably have expected to be subject to suit in New York in connection with the shipments to and sales within New York. And Hatu has not pointed to any countervailing considerations, such as a burden that defending this case in New York might pose for him. Although the Court can imagine that North Carolina might have an interest in this controversy, Hatu does not offer any reason why such an interest would justify overcoming New York City's paramount interest in a suit in which it centrally claims to have been the victim of a scam to cheat it of tax revenue. And the New York long-arm statute by nature does not tempt due process limits. On the contrary, "[t]he New York long-arm statute does not extend in all respects to the constitutional limits." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60–61 (2d Cir. 2012). Accordingly, the Court holds that both the minimum contacts and reasonableness requirements of due process have been met.

The Court therefore finds the exercise of personal jurisdiction over Hatu proper.

**III.    Motion to Dismiss for Failure to State a Claim**

**A.    Applicable Legal Standards**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of

entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

**B.     Discussion**

The City brings five claims against Hatu. They arise under the following statutes: the CCTA, 18 U.S.C. §§ 2341 *et seq.*, RICO, 18 U.S.C. §§ 1962(c)–(d) *et seq.*, the PACT Act, 15 U.S.C. §§ 375 *et seq.*, and the P.H.L., N.Y. Pub. Health L. § 1399-*ll*. Hatu moves to dismiss each claim under Rule 12(b)(6). For the following reasons, the Court denies Hatu's 12(b)(6) motion. The Court discusses the claims in turn, grouping together claims brought under the same statute.

**1.     CCTA**

The CCTA makes it unlawful for "any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342. The term "contraband cigarettes" refers to "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found," and which are in the possession of a person not authorized by statute to possess such cigarettes. *Id.* § 2341. To prevail on a claim under the CCTA, the City must show that Hatu (1) knowingly shipped, transported, received, possessed, sold, distributed or purchased (2) more than 10,000 cigarettes (3) that did not bear State or City tax stamps (4) under circumstances where the law required the cigarettes to bear such stamps. *City of New York v. Gordon*, 155 F. Supp. 3d 411, 420 (S.D.N.Y. 2015) (citing *City of New York v. LaserShip, Inc.*, 33 F. Supp. 3d 303, 312 (S.D.N.Y.2014)).

It is undisputed that the SAC adequately alleges facts to establish elements two through four. The SAC clearly alleges that the defendants transported, sold, and distributed more than 10,000 under-taxed cigarettes in New York State and City, SAC ¶ 53, that all these cigarettes lacked stamps, and that they "were delivered to a licensing stamping agent," *id.* ¶ 52. These allegations easily plead the final three elements.

The parties' dispute focuses on the first element—whether Hatu "knowingly shipped, transported, received, possessed, sold, distributed or purchased" the contraband cigarettes discussed elsewhere in the SAC. The Court has already held that the SAC adequately pleads that Hatu knowingly participated in the cigarette trafficking scheme. The outstanding issue is thus whether Hatu's conduct, as pled, constitutes any of the acts listed in the statute. The City contends that Hatu distributed cigarettes or caused cigarettes to be distributed in New York. SAC ¶¶ 50–53. Hatu counters that his connection to the sale of cigarettes in New York—which was ultimately carried out by people down the distribution chain from him and H&H—is too attenuated for him to be liable under the CCTA. Hatu Mem. at 25. The issue distills to whether (1) a wholesaler who did not physically bring contraband cigarettes into New York for sale in New York can be liable under the CCTA; and (2) whether a wholesaler can be held liable for such a transfer where, at the time the cigarettes left the immediate custody of the wholesaler, they were not yet contraband.

For the following reasons, the answer to both questions is yes, such that the SAC states a claim under the CCTA.

As to the first issue, the CCTA clearly applies to the knowing distribution of cigarettes in New York State and City. Allegations that a defendant "knowingly delivered enormous quantities of unstamped, untaxed cigarettes to persons throughout the United States, including

the State and the City . . . [are] sufficient to provide the grounds upon which plaintiffs' claims rest." *New York v. United Parcel Serv., Inc.*, 131 F. Supp. 3d 132, 138 (S.D.N.Y. 2015). Hatu argues that, to be liable under the CCTA, he must have "directly injected" cigarettes into New York. Hatu Mem. at 22. For the proposition that liability requires the defendant personally to have brought the cigarettes into the state, he relies on language in a 2012 district court decision, stating that CCTA "liability hinges on whether they have injected unstamped cigarettes directly into the New York State and City streams of commerce, avoiding the stamping system." *City of New York v. Chavez*, No. 11 Civ. 2691 (BSJ), 2012 WL 1022283, at *5 (Mar. 26, 2012). Hatu argues that upstream CCTA liability applies to "manufacturers, wholesalers and distributors . . . who take an active part in causing the cigarettes to enter—or be transported or sold within— another state without observing the other state's taxing protocol." Hatu Mem. at 22.

This Court does not read the CCTA to require that the defendant "directly" transport the cigarettes across state lines into New York. The text of the statute does not contain the word "direct" or otherwise require that a defendant's "injection" of cigarettes in New York be "direct" rather than a step in a chain towards that outcome. Rather, the statute, logically read, applies to distributors, whether early or late in the chain of events, who knowingly took action to bring about the "delivery" of the cigarettes into New York, with the intent of bringing about this result. The allegations in the SAC easily satisfy that requirement. Hatu's sales to Ammar and Alsaidi, as well as his sales to Akram and his store A&K—sales undertaken, as pled, with the knowledge that these cigarettes would be shipped to, and sold within New York—satisfy the requirement that he deliver untaxed cigarettes into commerce in New York State and City.

The reported cases involving upstream retailers and distributors are in accord. Courts have commonly denied motions to dismiss CCTA claims against such upstream parties. *See,*

*e.g.*, *City of New York v. Milhelm Attea & Bros. Inc.*, 550 F. Supp. 2d 332, 345–48 (2008) (denying motion to dismiss brought by stamping agent wholesalers who allegedly sold unstamped cigarettes to Native American retailers who then re-sold those cigarettes to consumers); *United States v. Mahoney*, No. CR-05-2099-RHW, 2007 WL 858633 (E.D. Wash. Mar. 19, 2007) (denying motion for reconsideration of denial of motion to dismiss brought by defendant wholesalers running a similar scheme). Such claims have also been sustained at summary judgment. *City of New York v. Milhelm Attea & Bros.*, No. 06 Civ. 2620 (CBA), 2012 WL 3579568, at *1 (E.D.N.Y. Aug. 17, 2012), is particularly instructive. There, the City alleged, *inter alia*, that defendant Gutlove & Shirvint, Inc., had sold untaxed cigarettes to retailers operating within Native American reservations, exploiting the fact that federal and state governments "lack the authority to tax cigarettes sold to Native American tribes for their own consumption." *Id.* at 2. The reservation retailers would then sell these untaxed cigarettes to outsiders to the reservation without paying the requisite state excise taxes. *Id.* at 1. The district court held that given the wholesaler's awareness that these downstream sales would follow, the wholesalers' actions as part of the scheme were "materially indistinguishable from selling bulk quantities of unstamped cigarettes directly to members of the public." *Id.* at 22. The same reasoning applies here.

As to the second question, there is no support for Hatu's theory that the cigarettes must have become "contraband" at the time when the upstream distributor defendant relinquished custody of them to a downstream co-conspirator. The CCTA's text does not support imputing this limitation on liability or exonerating a distributor who distributes cigarettes that have been taxed at the rate of a source state where the distributor intends them to be delivered, without additional taxes, to a higher-tax destination state. On the contrary, "Congress intended for the

CCTA to cover circumstances where a wholesaler or distributor of cigarettes sells and ships cigarettes that become contraband *because of* that sale and shipment." *Chavez*, 2012 WL 1022283, at *4 (emphasis added). Such is the City's allegation here. It alleges that when Hatu delivered the cigarettes to transporters Ammar and Alsaidi, he knew they would then transport the cigarettes to New York for sale without paying the requisite New York taxes. The act of transporting the cigarettes into New York for sale while evading New York's cigarette taxes, which, as alleged, derived from Hatu's delivery of the cigarettes to the transporters and the retailers, is what made them contraband. Accordingly, the Court holds that the SAC states a claim under the CCTA.

### 2.    RICO

The RICO Act makes it unlawful for any person employed by or associated with any enterprise engaged in or affecting interstate commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. Relevant here, "racketeering activity" includes trafficking in contraband cigarettes in violation of the CCTA. 18 U.S.C. § 1961(1). The City brings a substantive RICO claim and a RICO conspiracy claim, both relating to the illegal cigarette trafficking of the Enterprise. The Court assesses each RICO claim, as brought against Hatu, in turn.

#### a.    *Substantive RICO Claims*

Under 18 U.S.C. § 1962(c), the City must adequately plead that Hatu "conduct[ed] or participate[d], directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). In addition to satisfying this "operation or management" requirement, *Reves v. Ernst & Young*, 507 U.S. 170, 177–79 (1993), the City must plead two further elements to make out a viable substantive civil RICO claim. It must plead that

there was a pattern of racketeering activity, which requires (a) at least two predicate acts, *see* 18 U.S.C. § 1961(5), that are (b) related and "amount to, or pose a threat of, continuing criminal activity." *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995). Second, the City must "show that a RICO predicate offense 'not only was a "but for" cause of its injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). The SAC's substantive RICO claim against Hatu satisfies each of these requirements.

i.     Operation and Management

The SAC adequately alleges Hatu's participation in the operation and management of the Enterprise. As alleged, central to the enterprise's operation was that the enterprise be supplied relatively cheap cigarettes for sale in New York. And the SAC alleges that Hatu was the principal supplier of such cigarettes to the Enterprise's associates in New York.[5] That Hatu performed such a central function in the Enterprise pleads adequately that he exercised a degree of control over the Enterprise. *See 131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1527–28 (S.D.N.Y. 1995) (finding that where defendants made their company available to the enterprise as a trading partner, helping to "determine the enterprise's modus operandi," "it is not unreasonable to assume that Tese and Sinclair exercised a degree of control over the enterprise as a whole because of TSM's centrality to the scheme"). Had Hatu refused to supply cigarettes to the retailers or transporters or insisted on the payment of New York cigarette taxes, the Enterprise's illegal distribution of cigarettes would have been checked at its source. Consistent with this, the Dubroff Affidavit attached to the SAC states that on or about March 20, 2017, Hatu

---

[5] Hatu faults the SAC for not alleging any "conversation between Mr. Hatu or H&H and Ammar Shamakh, Maeen Alsaidi, or any 'Transporter.'" Hatu Mem. at 29. In fact, the SAC does allege that Hatu dealt directly with, and supplied cigarettes to, these individuals. *See* SAC ¶ 8.

and Akram discussed, on a recorded call, the NYPD's seizure of cigarettes that Hatu had

supplied. Dubroff Aff. ¶ 25f.  In that conversation, Akram expressed confidence that he and

Hatu would maintain their connections with their New York distributors, adding, "I'm planning

if they don't come back, I'm going to look for other ones anyway.  I will be able to find

customers it's not a problem." *Id.*  Akram, in other words, asserted that, provided that Hatu

performed the key task of supplying North Carolina-taxed cigarettes, Akram would find

downstream entities in New York to distribute them, so that the overall enterprise might profit.

The Court accordingly holds that SAC adequately alleges that Hatu participated in the

conduct of the Enterprise.

ii.      Pattern of Activity

A pattern of racketeering under RICO "is both a closed- and open-ended concept,

referring either to a closed period of repeated conduct, or to past conduct that by its nature

projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229,

241 (1989).  Hatu argues that the SAC does not adequately plead such a pattern, because it

purportedly fails to plead that Hatu engaged in any of the Enterprise's activities.

That caricature misreads the SAC.  As reviewed above, the SAC in fact alleges that Hatu

repeatedly engaged in illegal actions qualifying as RICO predicates.  It alleges that, on multiple

occasions, he sold North Carolina taxed cigarettes to individuals planning to sell those cigarettes

in New York without first obtaining New York tax stamps.  It further alleges that such activity

would have continued had the police not arrested the members of the Enterprise. *See DeFalco v.*

*Bernas*, 244 F.3d 286, 324 (2d Cir. 2001) (scheme was not inherently terminable where

defendant ceased participation after co-conspirator's demands became too onerous).  Further,

Detective Dubroff attests that during an intercepted conversation, Hatu "expressed concern to

28

Hassan" that the recent seizure by the police of nearly $300,000 worth of cigarettes would hurt his business and give rise to "an ugly . . . two, three weeks." Dubroff Aff. ¶ 25.f. This, too, signaled Hatu's intent that the scheme persist. The SAC thus amply pleads facts suggesting Hatu's participation in a pattern of racketeering acts.

### iii.    Proximate Cause

Proximate cause in the RICO context requires "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp.*, 559 U.S. at 9. Hatu argues that his acts bore too attenuated a connection to the sales of untaxed cigarettes in New York to satisfy this requirement. That, too, is wrong. As reviewed above, the SAC now ably pleads that Hatu placed North Carolina-taxed cigarettes in the hands of his co-conspirators expecting and intending that they would reach New York, where they would be sold without application of New York taxes. *See, e.g.*, SAC ¶ 7. Under these circumstances, New York State and City's loss in tax revenue from the illegal sale of under-taxed cigarettes is an economic injury that flows predictably and in a straight line from Hatu's acts. Simply put, his conduct, as alleged, helped cause the State and City's injury.

Accordingly, the Court holds that the SAC plausibly alleges that Hatu's predicate acts (his alleged CCTA violations) directly caused the City's injury. Hatu's motion to dismiss the City's § 1962(c) claim is therefore denied.

### b.    RICO Conspiracy Claims

To state a RICO conspiracy claim under 18 U.S.C. § 1962(d), the City must allege that Hatu "agree[d] to conduct or to participate in the conduct of a charged enterprise's affairs through a pattern of racketeering." *United States v. Pizzonia*, 577 F.3d 455, 464 (2d Cir. 2009). In other words, the City must allege that he agreed "to further an endeavor which, if completed,

would satisfy all of the elements of a substantive criminal offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997); *Baisch v. Gallina*, 346 F.3d 366, 376–77 (2d Cir. 2003) (RICO conspiracy stated if the defendant knew about and agreed to facilitate the scheme). "'[T]he requirements for RICO's conspiracy charges under § 1962(d) are less demanding' than those for substantive violations." *City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (quoting *Baisch*, 346 F.3d at 376). Unlike the substantive RICO claim, a RICO conspiracy claim does not require that the defendant have operated or managed the Enterprise. *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000).

Hatu moves to dismiss the City's RICO conspiracy claim on the grounds that the SAC does not allege that Hatu knew the North Carolina Retailers, or others implicated in the scheme, intended to transport the cigarettes H&H sold to New York or to do so without paying the required New York State and City excise taxes. Def. Mem. at 33. Hatu relatedly argues that the SAC's allegations do not support the inference that Hatu agreed to participate in this scheme. *Id.*

These arguments are quickly interred in light of the foregoing discussion. For the reasons discussed above in the course of analyzing personal jurisdiction, the SAC amply pleads that Hatu knew of and agreed to participate in the cigarette smuggling scheme, aware that the purpose of the participants was to sell H&H-provided cigarettes in New York State without payment of the required state and city taxes. And for the reasons discussed above in the course of analyzing the substantive RICO claims, the conduct in which Hatu agreed to participate constituted, as alleged, violations of a RICO predicate, the CCTA, in connection with the Enterprise. These allegations solidly support the inference that Hatu agreed to join the RICO conspiracy with awareness of its unlawful ends. *See United States v. Applins*, 637 F.3d 59, 81–82 (2d Cir. 2011) ("[I]t is sufficient to allege and prove that the defendants agreed to the commission of multiple violations

of a specific statutory provision that qualifies as RICO racketeering activity."); *see also United States v. Elliott*, 571 F. 2d 1181, 1197 (5th Cir. 1978) ("Where . . . the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable."). That the conspiracy took the form of a vertical distribution chain among colluding participants does not change this result, as the SAC satisfactorily alleges that "each defendant knew he was a member of a vertically integrated enterprise for the distribution" of cigarettes, supporting the inference that each agreed to participate in that conspiracy. *United States v. Martino*, 664 F.2d 860, 876 (2d Cir. 1981) (evidence supported that defendants participated in RICO conspiracy involving sale of narcotics, notwithstanding that suppliers and final buyers of narcotics were unaware of one another's identities).

The SAC also alleges with the required specificity Hatu's participation in acts furthering the enterprise's illegal affairs. *See United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009); *United States v. Persico*, 832 F.3d 705, 713 (2d Cir. 1987). It outlines the roles that associates in the enterprise played in the process of shipping, transporting, receiving, possessing, selling distributing, and/or purchasing in or into the City cigarettes that did not bear New York State and City tax stamps. *See, e.g.*, SAC ¶¶ 2, 33, 39. And it alleges Hatu's role early in this sequence of selling cigarettes to the North Carolina retailers (such as Akram) or transporters (such as Ammar and Alsaidi) with the understanding that these cigarettes would be resold, with no added taxes imposed, to consumers in New York. *See, e.g., id.* ¶ 45. These allegations amply allege Hatu's knowing participation in the scheme. *See Baisch*, 346 F.3d at 376–77 (2d Cir. 2003).

The Court therefore denies Hatu's motion to dismiss the RICO conspiracy claim.

31

### 3.    PACT ACT

The PACT Act prohibits a wide array of conduct, including delivering cigarettes into a state or locality without (1) first filing a statement with the Attorney General of the United States and the tax administrators of the state; (2) filing monthly reports of all cigarette shipments with the tax administrators of the state; (3) complying with state and local laws governing the sale of cigarettes; (4) complying with certain shipping and packaging requirements; and (5) using a method of shipping that requires the person who receives the delivery to provide age verification. The PACT Act regulates "delivery sales," defined as "any sale of cigarettes or smokeless tobacco to a consumer if . . . the consumer submits the order for the sale by means of a telephone or other method of voice transmission, the mails, or the Internet or other online service, or the seller is otherwise not in the physical presence of the buyer when the request for purchase or order is made." 15 U.S.C. § 375(5)(A).  A delivery seller must comply with the tobacco laws, including the tax laws, of the State into which the products of a delivery sale are physically delivered.  15 U.S.C. § 376a.

The SAC here alleges, based on substantially the same factual allegations above, that Hatu violated the PACT Act by delivering unstamped cigarettes into New York.  Hatu makes two arguments in support of dismissal.[6]  First, he contends that the sales in which he participated were not "delivery sales" because Hatu sold to retailers, not directly to consumers, which the PACT Act defines as not to "include . . . retailer[s] of cigarettes."  15 U.S.C. § 375(4).  Hatu

---

[6] The SAC alleges that the cigarettes were ordered by text message.  SAC ¶ 38.  Although Hatu does not challenge the SAC's pleadings on this point, the Court has considered whether such communications satisfy the requirement that "the consumer submit the order for the sale by means of a telephone" or that the consumer not be "in the physical presence of the buyer when the request for purchase or order [was] made."  15 U.S.C. § 375(5)(A).  The latter alternative is adequately pled.

Mem. at 41.  Second, he argues that the cigarettes must have been distributed "in interstate commerce," whereas as alleged, he delivered cigarettes to scheme participants who, at that time, were in North Carolina.  Hatu Mem. at 41.

Neither argument is persuasive.  As to the first point, Hatu mischaracterizes the SAC, which alleges that Hatu and H&H delivered cigarettes "directly to Ammar or [Alsaidi]," SAC ¶ 45, whom it alleges were not retailers but transporters of cigarettes from North Carolina to New York.  And Ammar and Alsaidi do not fit within any statutory exemption.  In any event, even if Ammar and Alsaidi qualified as retailers, the PACT Act exempts only those who are operating lawfully, and the SAC squarely alleges that Ammar and Alsaidi were not doing so, but instead were cogs in an illegal cigarette distribution scheme.  The SAC therefore adequately alleges that Hatu distributed the cigarettes to consumers; that is, individuals who "purchase[] cigarettes or smokeless tobacco."  15 U.S.C. § 375(4).  As to the second point, Hatu misstates the law.  The PACT Act does not require delivery sales to have occurred in interstate commerce. *See* 15 U.S.C. § 375(5)(A).  Accordingly, Hatu's objections to the SAC's PACT claim fail merit.

### 4.    New York Public Health Law

Finally, New York P.H.L. § 1399-*ll* prohibits "ship[ping] or caus[ing] to be shipped any cigarettes to any person in [New York State] who is not" a licensed cigarette tax agent or wholesale dealer, export warehouse proprietor, or government official.  The shippers may be "located within or without the state."  *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 211 (2d Cir. 2003).  The prohibition against "ship[ping] or caus[ing] to be shipped" applies to "one actor causing another to transport something."  *Id.*, 320 F.3d at 214–15.

Hatu argues that the SAC fails to state a claim because it does not allege that Hatu or H&H shipped any cigarettes to any recipient in New York.  Hatu Mem. at 29.  The City counters

that while Hatu did not directly ship cigarettes to a person located in New York, he caused

cigarettes to be shipped to an unauthorized person within New York State, as reviewed above.

Pl. Mem. at 40.

Hatu's argument is again without merit.  The statute, by its terms, applies not only to

shippers who ship directly to unauthorized individuals in New York but also to those who cause

such shipments.  *See* N.Y. P.H.L. § 1399-*ll*; *Brown & Williamson Tobacco Corp.*, 320 F.3d at

214.  The SAC plausibly pleads that Hatu caused such shipments, by putting North Carolina-

taxed cigarettes in the hands of Ammar and Alsaidi, knowing that the two were working for the

Enterprise and would furnish the cigarettes for sale to consumers in New York State and City

without paying the requisite excise taxes.  Accordingly, the SAC states a claim under New York

P.H.L § 1399-*ll*.

## CONCLUSION

For the foregoing reasons, Hatu's motion to dismiss is denied in full.  The Clerk of Court

is respectfully requested to terminate the motions pending at Dkt. 72, Dkt. 80, and Dkt. 108.

Discovery will now commence.  By Tuesday, June 11, 2019, the parties are to submit a

proposed case management plan, consistent with the Court's individual rules, that provides for

the close of fact discovery by the end of September 2019.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: May 31, 2019
       New York, New York